

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00096-CV

IN THE INTEREST OF A.H., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant L.H. (Mother) appeals the trial court's judgment terminating her parental rights to her son, A.H. (Andy).[2]  In four issues, Mother contends that the evidence is legally and factually insufficient to support the trial court's judgment. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect A.H.'s identity, we will use "Andy" as an alias to refer to him, and we will also use aliases to refer to other people associated with the termination of Mother's parental rights.  *See* Tex. R. App. P. 9.8(b)(2).

## Background Facts

Mother was born in 1987. By her teenage years, she was living with her grandmother, E.H. (Edith). At age fifteen, Mother ran away from Edith's house and moved in with P.H. (Peter), who was then twenty-four years old. Peter introduced Mother to cocaine, and when Mother was still fifteen years old, she and Peter conceived a child, C.H. (Charles), while both were under the influence of the drug. Mother continued to use cocaine while pregnant with Charles and gave birth to him in approximately 2004. Around that same time, Mother and Peter, who eventually married each other, moved to Kansas.

Mother and Peter had a second child, B.H. (Bethany), a couple of years after Charles was born. Soon after Bethany was born, Peter used methamphetamine and began drinking heavily, and Mother and Peter divorced. In 2007, when Mother and the children were spending the night at Peter's house, Mother and Peter got into a fight, for which Mother was arrested and later convicted of "domestic violence." Soon after that fight, Kansas Social Rehabilitation Services (SRS) obtained custody of Charles and Bethany, and they initially went to foster care. Mother attempted to work with SRS to have her children returned, but Mother was unable to get adequate housing as requested by SRS, so the children eventually went to live with Peter's sister.

Also in 2007, Mother met C.W. (Father) and moved in with him. At the time, Father was forty-two years old. Mother knew that Father was addicted to methamphetamine, and soon after their relationship started, they began using

2

drugs together. In August 2007, they were pulled over by police in Kansas while riding in a car together. Mother was arrested for driving without a license, while Father was arrested for obstruction of justice because he gave the police a false name. According to Mother, while she was being booked into jail, guards found a bag of methamphetamine in her pants pocket, for which she was charged with possession of methamphetamine and trafficking methamphetamine in a penal institution.[3] Mother testified that after her arrest for driving without a license, it "slipped [her] mind" that she had the methamphetamine in her pocket. She pled nolo contendere to the charges.

Mother was released from confinement in July 2008, seemingly to serve probation. Andy was conceived in early August 2008, shortly before Mother was sentenced to incarceration in a Kansas penitentiary on August 20, apparently for violating the probation by "not reporting."

Mother was incarcerated in Kansas for all nine months of her pregnancy with Andy, and in May 2009, she gave birth to him. Upon Andy's birth, Edith (Mother's grandmother) went with L.H. (Lois), Mother's mother, to Kansas to pick

---

[3]The record contains criminal judgments from Kansas. One judgment, for possession of methamphetamine, has a "Date of Offense" of August 15, 2007, which is the date that Mother said that she was arrested for driving without a license. The possession of methamphetamine judgment relates that Mother was placed on probation. The second judgment, for "Traffic in Contraband in a Penal Institution," states that the offense was committed on September 21, 2007 and that Mother received a thirty-six-month probated sentence. There is no explanation in the record concerning why Mother's judgments bear different offense dates or why the second judgment bears an offense date that is different than the date on which Mother testified that the crime occurred.

him up. Mother chose to have Andy live with Edith in Texas because Edith was "the only family [she had] and [Andy's] father was not capable of taking care of him at the time."[4] Mother believed that Edith could adequately care for Andy until Mother was released from confinement.

On August 9, 2010, when Andy was approximately fifteen months old, the Fort Worth Fire Department was called to Edith's house. A mattress in the house had caught fire in a room where Lois was sleeping. Andy was home when the fire started.

Officer Rena Dulworth of the Fort Worth Police Department was called to Edith's house by the fire department to investigate the possible kidnapping of Andy. A dispute had arisen between Edith and Lois about who should care for him. Edith told Officer Dulworth that Lois had removed Andy from the house and had placed him in a van driven by Lois's boyfriend. Lois claimed that Edith was unable to take care of Andy and that Lois was his primary caregiver. Edith claimed that she had custody and that Lois did not. The van was found driving around the neighborhood not far from the house, and Andy was returned to Edith. In speaking with Edith, Officer Dulworth noticed that she did not seem well. Particularly, Edith moved around very slowly, was unsteady on her feet, and appeared to have soiled herself. Officer Dulworth testified that she could not imagine that Edith could have cared for a small child.

---

[4]Edith was born in 1948, so she was approximately sixty-one years old in 2009 when she went to Kansas to get Andy.

4

Officer Dulworth obtained the consent of J.H., Andy's great-grandfather, to search the home. Upon the search, Officer Dulworth found the home to be in a state of disarray. The carpet was heavily stained and littered with dirt, trash, and food particles. Items and clothing were stacked and strewn all around the house. Officers found a loaded semi-automatic pistol on a windowsill in a bedroom where Andy sometimes slept. They also found loose pills within Andy's reach. During the search, Officer Dulworth saw Andy roaming freely around house, at one point picking up a plastic knife and running with it. Based on the state of the home, Officer Dulworth became concerned for Andy's safety and called for the Department of Family and Protective Services (the Department) to evaluate the home.

An investigator from the Department, Teresa Shipley, went to the home that evening and determined that Edith was unable to care for Andy, that the home was unsafe for him, and that Edith had a history with the Department because she had previously "refused to accept parental responsibility" of a child. In the home, Shipley found "lots of little pieces of stuff like screws, trash, things all over the carpet, . . . [and] various small items." Shipley also noticed a bad odor in the home. Shipley saw that Edith had difficulty moving around the house. The Department removed Andy from the home, placed him in foster care, and filed its petition for termination soon thereafter.

At the time of the trial in July 2011, Mother was still incarcerated in Kansas, and Andy was two years old and had been in his foster placement for

almost a year. Mother, who testified telephonically, said that excluding time that she had been incarcerated, she had not been sober for more than three consecutive months since she began using cocaine with Peter at age fifteen. Mother also admitted that prior to the arrest that had led to her current incarceration, she had been convicted of theft and driving while her license was suspended in addition to her conviction for hitting Peter. She stated that she had known that Father used methamphetamine when they met but that she had not known that he had an extensive criminal record.

Mother testified that she was not aware of the condition of Edith's home or of Edith's poor physical condition. Mother conceded, however, that she knew that her mother, Lois, lived in Edith's home, that Lois had a long history of drug abuse, and that she had considered Lois's addiction when placing Andy in the home but was not concerned about it. When asked about her work and living history, Mother testified that the longest she had ever held a job was eight months, that she had worked at two other jobs for one and four months each, and that she had never rented or owned a residence on her own.

When asked whether she had completed the court-ordered service plan, Mother testified that she had completed some of the plan but that she could not complete other requirements—regular visitation with Andy, proof of income, and appropriate housing—because she was incarcerated. She stated that she has earned a certificate in landscaping and would pursue employment in that field upon her release, which she believed would occur a little more than a month after

6

the trial concluded. She claimed that upon her release, she would immediately enter a thirteen-week program to help her find housing and employment. She believed that she would be able to provide an appropriate home for Andy within a month, but she conceded that she would not likely have a job for five or six weeks after her release, and she was "not sure" about what she would do with Andy until she was ready to take him.

Mother testified that she will be required to live in Topeka as a condition of her parole and that she has no family and only one friend there. She testified that while she planned on completing drug treatment upon her release, she felt that she did not need it. Mother also planned on resuming her relationship with Father, whom she admitted has a drug problem and is in need of treatment. She also admitted that she did not have a problem with Andy staying in an adult treatment facility with many felons.

Kimberly Bailey, who works for the Department as a conservatorship supervisor, testified that the original goal for Andy was reunification with his parents. However, Bailey testified that as the Department attempted to work toward returning Andy with Mother and Father and their families, the goal changed to termination when it became clear that neither parent would be in a position to care for Andy in the near future. Bailey testified that no family member had requested custody of Andy since he was removed from Edith's home and that the Department had determined that none of the placements proposed by Mother and Father were appropriate since the only blood relatives

proposed were not able to take care of Andy. Bailey stated that Father had not completed any of the services listed in his service plan, such as parenting classes or counseling, and had not been in regular contact with CPS. She conceded, however, that while confined, Father was "on a unit that was more restrictive in terms of accessibility to the types of services that [the Department] had requested that he participate in."

Bailey also opined that Andy had bonded with his foster mother, while he had little to no bond with Mother or any blood relatives. She explained that Andy was "doing great" physically and was on target developmentally, and she expressed that the Department planned on allowing his foster parent to adopt him. She stated that with his foster parent, Andy seemed "comfortable" and "at home." When Bailey was asked why she believed that termination of Andy's parents' rights was in his best interest, she testified, "[Andy] deserves an opportunity to be in a home where he's safe, where all his needs are being met, and [where] he has an opportunity to thrive, and I don't believe his parents have demonstrated that they can do it and will do it."

G.F. (Grace), Andy's foster mother, testified on her own behalf as an intervenor in the case. Grace said that she loved Andy, that Andy loved her, and that Andy had bonded with her and her family. She testified that Andy was happy and healthy, with the exception of recurring problems with ear infections, for which he was receiving appropriate treatments. Grace testified that neither Father nor Mother had been in contact with Andy since he began living with her

8

and that the only contact he had with any blood relatives consisted of two or three visits from Edith and a maternal aunt, the last of which was several months before the trial. Grace expressed her desire to adopt Andy.

The trial court terminated Mother's paternal rights to Andy, finding that she had engaged in conduct or had knowingly placed Andy with persons who had engaged in conduct that endangered his physical or emotional well-being, had knowingly placed or allowed him to remain in conditions or surroundings that endangered his physical or emotional well-being, and had failed to comply with a court order setting out the actions necessary to secure his return.[5] The trial court also found that termination was in Andy's best interest. Mother brought this appeal.

### Evidentiary Sufficiency

In her first three issues, Mother contends that the evidence is legally and factually insufficient to sustain the trial court's finding that she committed one of the grounds for termination listed in section 161.001(1) of the family code. In her fourth issue, she argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in Andy's best interest.

---

[5]*See* Tex. Family Code Ann. § 161.001(1)(D), (E), (O) (West Supp. 2012). The trial court also terminated Father's parental rights, but he is not a party to this appeal.

9

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

10

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one subsection of section 161.001(1) and that the termination of the parent-child relationship was in the best interest of the child. Tex. Fam. Code

11

Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Mother's endangerment of Andy**

In her second issue, Mother contends that the evidence is legally and factually insufficient to sustain the ground for termination under section 161.001(1)(E) of the family code. *See* Tex. Family Code Ann. § 161.001(1)(E). Under section 161.001(1)(E), termination may be supported by a finding that a parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. *See id.*

As we have explained,

> Endangerment means to expose to loss or injury, to jeopardize. Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's . . . well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act. Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury.* The specific danger to the child's well-being may be inferred from parental misconduct standing alone. Moreover, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. To determine whether termination is necessary, courts

12

may look to parental conduct occurring both before and after the child's birth.

*In re M.E.-M.N.*, 342 S.W.3d 254, 261–62 (Tex. App.—Fort Worth 2011, pet. denied) (emphasis added) (citations omitted).

The evidence reveals a pattern of Mother's acts by which the trial court could have reasonably formed a firm belief or conviction that she knowingly engaged in conduct that endangered Andy's physical or emotional well-being. This is true even though, as Mother testified at trial and argues on appeal, she had no knowledge of the condition of Edith's home or of the deterioration of Edith's health at the time of Andy's removal.[6]

Mother's testimony established that she has a long history of abusing controlled substances and that the use of those substances has exposed her to imprisonment and to her separation from Andy. She testified that she had begun using cocaine at age fifteen and that she had used it while pregnant with her first child, Charles. Mother admitted to using illegal drugs with both of the fathers of her children, and she is currently incarcerated because she possessed contraband in a jail facility. Mother testified that other than the time she has been incarcerated, the longest period of time she has even been sober since she turned fifteen years old was three months. Despite this, Mother, who at the time of trial was twenty-three years old, testified that she does not believe she is in

---

[6]Bailey agreed that neither parent was aware of the conditions of Edith's home at the time of Andy's removal from that home.

13

need of drug treatment. A parent's use of narcotics, both before the birth of a child and while the parent had custody of older children, can constitute endangering conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *M.E.-M.N.*, 342 S.W.3d at 263; *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."). Thus, the trial court could have found that Mother endangered Andy's physical or emotional well-being through her long-term drug abuse.

Mother also has a history of criminal violations (including some that are not drug related) and incarceration. She was convicted of theft at some point after her other two children had been removed from her care in Kansas. Mother testified that she had "picked up $24 at McDonald's and it happened to belong to somebody else." Mother was also convicted in 2007 for hitting Peter, the father of her oldest children, while the children were present in Peter's home. Mother was also convicted of possession of methamphetamine and attempting to take methamphetamine into a jail, for which she has been incarcerated for Andy's entire life. Further, Mother admitted to violating prison regulations during her current incarceration, resulting in her loss of thirty-two days of good time credit

14

and therefore delaying her release. Mother lost "good time" more than once for having cigarettes in jail, which Mother knew was illegal.

Because of her current incarceration, Mother was not able to care for Andy and gave him to Edith, knowing that Lois, who had a history of using drugs and committing crimes, lived in Edith's home.[7] Similarly, Mother had left Charles and Bethany for about a month with a known drug user, Peter, before their removal in Kansas while she "went to obtain new housing." Mother's endangering conduct toward her other children is relevant to whether she endangered Andy. *See In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied). And as of the beginning of the trial, even though Mother had received knowledge about the dangerous conditions in Edith's home at the time of Andy's removal, Mother's immediate plan for Andy was to return him to that home.

While criminal violations and incarceration are not enough to show endangerment by themselves, they can be evidence of endangerment if shown to be part of a course of conduct that is endangering to the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987); *Perez v. Tex. Dep't of Protective and Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.). Combined with her drug use, her unstable work and living history, and her decisions to leave her children with known drug users, the trial court could have reasonably concluded that Mother's history of criminal violations

---

[7]Lois had been arrested for possessing marijuana, unlawfully carrying a weapon, theft by check, and possessing a controlled substance.

15

and incarcerations affected her ability to provide a stable living environment for Andy and thus endangered his physical or emotional well-being. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (holding that constant incarceration, failure to provide support for child, and failure to maintain any relationship with child is evidence of endangerment); *In re M.R.*, 243 S.W.3d 807, 818–19 (Tex. App.—Fort Worth 2007, no pet.) (holding that the placement of a child in a living situation with known drug users was a factor supporting endangerment); *Perez*, 148 S.W.3d at 436–37 (holding parent's history of substance abuse, criminal conduct, and incarceration sufficient to show endangerment); *see also In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at *4 (Tex. App.—Fort Worth July 16, 2012, pet. denied) (op. on reh'g) (en banc) ("Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being.").

We hold that under the applicable standards of review, considering all of the facts described above, the evidence is legally and factually sufficient to sustain the trial court's finding that Mother engaged in conduct that endangered Andy's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). We therefore overrule Mother's second issue. Because one finding under section 161.001(1), along with a finding that termination is in the child's best interest, is sufficient to sustain an order of termination, we decline to address Mother's first and third issues, which challenge the sufficiency of the

16

evidence to prove the grounds of termination under section 161.001(1)(D) and (O). *See* Tex. R. App. P. 47.1; *In re Z.C.*, 280 S.W.3d 470, 475 n.22 (Tex. App.—Fort Worth 2009, pet. denied).

**Andy's best interest**

In her fourth issue, Mother contends that the evidence is factually insufficient to sustain the trial court's finding that termination of her parental rights is in Andy's best interest. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Undisputed evidence of just one factor may be sufficient in a particular

17

case to support a finding that termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 27. On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

A factfinder may consider a parent's continuing use of illegal drugs as a factor affecting the best interest of the child. *See M.R.*, 243 S.W.3d at 820; *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.). A parent's criminal record also reflects on the best interest of the child in maintaining a relationship with that parent. *See V.V.*, 349 S.W.3d at 558.

Most of the factors listed above weigh in favor of the trial court's decision that termination is in Andy's best interest. For example, based on Andy's lack of an emotional connection to either parent or any of his biological family, his bond with his foster mother, Mother's history of failing to provide for her children, her problems with drug addiction, her criminal history, her stated plans (including reuniting with Father, who has an extensive criminal and drug history),[8] and her lack of a supporting extended family, the trial court could have reasonably concluded that it is unlikely that Mother would be able to consistently provide for Andy's physical and emotional needs and that Mother would instead present a threat to his future well-being. Regarding Mother's drug use, although her confinement had provided her with an extended period of sobriety, the trial court

---

[8]The record contains documents establishing that Father has been convicted for selling marijuana, possessing marijuana, possessing drug paraphernalia, possessing methamphetamine, criminally using a credit card, and driving while under the influence of alcohol or drugs.

18

could have been reasonably skeptical about her ability to maintain a drug-free lifestyle upon her release from confinement even if, as she testified, she planned on attending Narcotics Anonymous. Mother had not demonstrated that she could achieve extended sobriety while not incarcerated, and she opined that she did not need treatment for her drug abuse.

Moreover, Mother recognized that upon being released from confinement and obtaining a place to live, Andy would not recognize her and would likely have anxiety about being placed with her. She conceded that it was best for Andy to be in a place where he is safe, stable, and could be loved and protected. Mother kept minimal contact with Andy (she sent him a blanket, a birthday card, and wrote letters "three or four times"); in contrast, Mother wrote letters to Father "once or twice a week." The evidence demonstrated that Andy was being nurtured in Grace's home, had bonded with her, and was also "very close" to Grace's parents and other family members. Evidence of a child's bond with a foster family is a factor that may support termination. *See In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g).

In jail, Mother obtained her GED; took classes on offender workforce development, nutrition management, and money management; and completed Thinking For A Change, a ten-week program aimed at developing positive thought processes. She also finished part of her service plan, including taking parenting classes and a psychological evaluation and participating in counseling. But Mother had not demonstrated proper parenting abilities in the past to any of

19

her three children, and the trial court could have considered that it was unlikely that she had developed those skills while incarcerated because, for example, she proposed to allow Andy to return to live with Edith or to bring Andy into a residential program for felons before having a job or being able to financially provide for Andy's needs. Also, although Mother indicated a desire to "follow the rules" upon being released from confinement, she recognized that even while she was confined, she was not able to control her conduct. Mother planned on taking a thirteen-week job-skills program upon being released from confinement, but the trial court could have been reasonably skeptical about her ability to maintain employment based on her prior work history. Mother offered no excuse for her behavior at trial.

Applying the appropriate standards of review, we hold that the evidence is factually sufficient to support the trial court's decision that termination of Mother's rights is in Andy's best interest. *See* Tex. Fam. Code Ann. § 161.001(2). We therefore overrule Mother's fourth issue.

20

**Conclusion**

Having overruled all of Mother's issues necessary for disposition, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DELIVERED:  September 27, 2012